IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **00-cv-02237-JLK**

**BENJAMIN V. JIMENEZ,**

    Plaintiff,

v.

**JOANNE B. BARNHART, Commissioner of Social Security,**

    Defendant.
_____

ORDER
_____

KANE, J.

    Plaintiff Benjamin Jimenez seeks review of the final decision of the Social Security Commissioner denying him Social Security Disability and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383(c), respectively.  Jurisdiction exists under 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405.

I.  Facts and Procedural History

    On August 11, 1997, Jimenez filed an application for a period of disability, disability insurance benefits, and supplemental security income pursuant to Sections 216(I), 223, and 1614(a)(3)(A) of the Act.  He claimed he had been disabled since January 23, 1997, due to myofascial pain disorder.  His claims were denied on November 26, 1997, and he filed a timely request for a hearing on May 19, 1998.

The Administrative Law Judge ("ALJ") held a hearing on May 5, 1999, which was postponed so Jimenez could undergo a psychiatric evaluation. R. at 36-37. Jimenez appeared and testified at the subsequent hearing on November 22, 1999, and was represented by an attorney. (R. at 40.) A vocational expert ("VE") also testified. (R. at 40.)

On January 11, 2000, the ALJ denied benefits after concluding Jimenez was not disabled. (R. at 27.) The ALJ found Jimenez retained a residual functional capacity ("RFC") allowing for occasional reaching, handling, or fingering with the right upper extremity, among other things. (R. at 23.) Based on this RFC, the VE testified that Jimenez could still perform occupations such as private dispatcher, escort vehicle driver, and employment screener, jobs that existed in significant numbers in the national economy so Jimenez was disqualified from disability. (R. at 24.) The Appeals Council declined review (R. 7-9) and Jimenez initiated an action in this court on November 8, 2000.

On March 20, 2001, I issued an Order remanding the case to the Commissioner, determining all of the jobs identified by the VE in Jimenez's case required "frequent," rather than "occasional," reaching and handling, which did not conform to his RFC. (R. at 469.) The Commissioner was ordered to acknowledge and resolve this discrepancy, *see id.*, and the Appeals Council ultimately vacated the January 2000 ALJ decision for further proceedings consistent with the March 2001 Order.

A new ALJ reheard Jimenez's claim in June 2002. In a decision dated July 5,

2002, the ALJ again determined Jimenez was not disabled.  Jimenez's renewed appeal is before me for determination.

### A. Medical Background

Jimenez was born on September 13, 1953 and was 43 years old at the time of his alleged disability.  (R. at 410.)  He was a high school graduate, R. at 402, and was employed by Target as a warehouse worker.  (R. at 299.)  In August 1991, he suffered a worker's compensation injury removing a 70 to 80 pound box from a shelf. (R. at 289.)  X-rays and MRIs taken at the time were within normal limits. (R. at 289.)  Plaintiff re-aggravated his injuries in April 1995 while carrying a box. (R. at 296.)  As described below, several doctors evaluated Jimenez, diagnosing him with myofascial pain disorder.  As a result of his injuries, Jimenez has not worked since January 23, 1997.  (R. at 92.)

The first medical evidence in the record dates from mid-1995. From June through August 1995, Dr. Louis Cabiling treated Jimenez with myofascial release (MFR) several times.[1]  (R. at 232-39.)  From September 1995 until September 1996, Jimenez saw Dr. Steven Kinnett with complaints of pain in the middle of his right shoulder blade and on the right side and lower back.  (R. at 289.)  At the first examination, Jimenez could perform all activities of daily living.  (R. at 290.)  He had full range of motion of the cervical spine, thoracic, and lumbar spine, his left periscapular mobility was within normal limits, but mobility on his right side was markedly reduced by tenderness.  (R. at

---

[1] MFR is "generally an extremely mild and gentle form of stretching that has a profound effect upon the body tissues." R. at 240.

290-91.) After the examination, Dr. Kinnett recommended aggressive soft tissue mobilization and MFR techniques with corticosteroid trigger point injections. (R. at 291.) Plaintiff was also in physical therapy and biofeedback at this time. (R. 286-88.)

At an examination on October 9, 1995, Jimenez had diminished strength and range of motion in the shoulder, but had no paresthesias or neurologic changes in the upper extremity. (R. at 287.) Jimenez quit physical therapy in November 1995, R. at 285, but started up again in February of 1996. (R. at 283.) He got trigger point injections in late March of 1996. (R. at 282.)

In May 1996, Jimenez told Dr. Kinnett the trigger points and the MFR were not helping. (R. at 280.) A functional capacity evaluation at that time showed Jimenez could do a light level of work, with his main limitation being his carrying capacity of 33 pounds. (R. at 279.) Jimenez's work at the time was modified duty as a fork lift operator. *Id.* In September 1996, Dr. Kinnett concluded Jimenez suffered from a 12 percent impairment of the whole person based on his injuries. (R. at 274.)

In November 1996, Plaintiff saw Dr. Timothy Sandell for right shoulder pain. (R. at 296.) At that time, claimant had good range of motion, but also had tender points throughout his cervical and mid-thoracic paraspinal muscles. He had good motor strength throughout his upper extremities without focal motor weakness or muscle atrophy. However, Dr. Sandell did note some give-way weakness when testing the right shoulder abduction and right elbow flexion. (R. at 297.) He concluded Jimenez's right shoulder pain appeared to be musculoskeletal with some myofascial pain with intermittent

4

exacerbations aggravated by activity. (R. at 298.)  In December 1996, Jimenez returned for EMG and nerve conduction studies, which all returned results within normal limits. (R. at 292.)  Dr. Sandell opined that Jimenez would be a candidate for a pain management program when other measures have been exhausted. (R. at 298.)

In December 1996, Jimenez saw Kevin Boehle, D.O., who found moderate tenderness in his right upper extremity, with slightly limited range of motion. (R. at 311.) Dr. Boehle opined that his findings were consistent with chronic myofascial pain syndrome in that paraspinal muscles and parascapular region. (R. at 311.)  After an evaluation for partial impairment rating, he imposed permanent work restrictions of no repetitive motions of the right shoulder, no lifting over 20 pounds, no repetitive lifting, no repetitive overhead reaching, no carrying over 30 pounds, and no repetitive twisting or bending of the neck or upper spine. (R. at 299-300.)

Jimenez's primary physician during this entire period of time was family practitioner Dr. George Berens.  Berens has treated Jimenez since at least 1997 and referred him to a number of the physicians whose evaluations are in the record.  Dr. Berens diagnosed diffuse right parascapular myofascial pain disorder and recommended various treatments including drugs such as Ultram, Cataflam, NSAID, Flexiril, and Voltaren, as well as injections of Aristocorte Forte and lidocaine. (R. at 277-31.)  Dr. Berens also recommended Jimenez participate in a pain management program. (R. at 227.)  Beginning in 1997, he restricted Jimenez's use of his right arm for anything more than light duty. (R. at 344.)

5

On July 31, 1997, Plaintiff underwent a psychological evaluation at Parkview Episcopal Medical Center. (R. at 319.) Dr. Carlos Rodriguez, Ph.D., concluded Jimenez had somatoform disorder, a history of substance alcohol/marijuana abuse, and prominent dependent personality disorder traits. (R. at 321.) He opined Jimenez would be an appropriate candidate for involvement in the pain program after clarification of these disorders. (R. at 322.)

On August 12, 1997, Plaintiff saw Dr. Dexter Koons, M.D., for a consultation. (R. at 314.) Dr. Koons noted Jimenez was taking Ultram and Cataflam, which purportedly in combination controlled the pain. (R. at 314.) Towards the end of August, Jimenez was discharged from Parkview Episcopal Medical Center. (R. at 201.) He expressed lack of interest in the pain program and discontinued physical therapy after a single treatment. (R. at 201.)

On October 1, 1997, Dr. Koons examined Jimenez again for pain in the right shoulder. (R. 211.) An MRI of the right shoulder demonstrated mild deltoid bursitis, while results from MRIs on the right scapula and thoracic spine were essentially normal. (*Id.*) Plaintiff had normal strength and sensation in upper and lower extremities. Based on this examination, Koons believed Jimenez would be a good candidate for the chronic pain program. (*Id.*)

On October 31, 1997, Jimenez returned to Dr. Berens and received another injection of Aristocort Forte and lidocaine. (R. at 226.) Dr. Berens also told him to continue taking Cataflam and Ultram as needed. R. at 226.

On November 17, 1997, Plaintiff saw Dr. David Crosson, M.D.  At the time, he reported he was able to perform all the activities of daily living.  (R. at 213.)  After a physical examination, Dr. Crosson concluded that although Jimenez had clinical findings, they were not significant.  (R. at 215.)  He also found Jimenez was not disabled and could perform any job for which he was qualified. (*Id.*)

On the next day, Jimenez saw Dr. Patrick Timms, M.D., for an evaluation.  (R. 217.)  Dr. Timms noted some slight restriction of bilateral rotation, and tenderness in the right paracervical and right parascapular regions.  (*Id.*)  Plaintiff's shoulder and elbow had full range of motion, although a motor examination revealed give-way weakness. (*Id.*)  Dr. Timms diagnosed chronic cervical and thoracic myofascial pain and prescribed Baclofen and Trazodene.

From February to July 1998, Plaintiff saw Dr. Berens several times for increasing back and shoulder pain.  (R. at 219-25.)  Dr. Berens opined that he was not sure anything could be done for Jimenez's parascapular strain and myofascial pain disorder.  (R. 225.)  A muscular biopsy came back normal, and no neuromuscual junction deficit or abnormality existed in the area causing him pain.  (R. at 219.)  Nonetheless, Dr. Berens restricted Jimenez from any reaching, lifting, grasping, or twisting in the right arm.  (R. 340.)  Berens also said Jimenez required retraining for other jobs and indicated Jimenez could perform light or sedentary occupations.  (R. at 336.)

In August 1998, Plaintiff went to Dr. William Herrera, M.D. with complaints of persistent numbness in the right shoulder, arm, and fingers along with muscle spasms and

pain in the upper neck. (R. at 323.)  The doctor noted some pain in rotating the chin and tenderness in the parascapular area on the right. (R. at 324.)  However, the examination of the shoulder and paraspinous muscles was otherwise "unremarkable."  (R. at 324.)

On December 30, 1998, the Division of Labor referred Jimenez to Dr. Howard Shoemaker, M.D., for an independent medical examination for his ongoing complaints of pain related to April 1995 warehouse work injury.  (R. at 325.)  Dr. Shoemaker concluded Jimenez was at "maximum medical improvement" (MMI) and needed to be more physically active and vocationally re-enter the work force.  (R. at 327.)  Shoemaker agreed Jimenez should have some limitations on his work capacity including avoiding any strenuous or repetitive use of the right arm, heavy lifting with the right arm, and any out of body reaches or above head reaches with the right arm, but should be employable at a job requiring only light or sedentary physical activity.  (R. at 328.)

On April 14, 1999, Dr. Berens completed a questionnaire from Plaintiff's attorney. (R. 330.)  At this point, Berens agreed Jimenez could not work any full-time job based on the level of his symptoms.  On May 21, 1999, Berens reiterated the work restrictions on reaching, lifting, carrying, or repetitive motion in the right arm.  (R. at 347.)

On July 16, 1999, Plaintiff saw James Evans, Ph.D. with complaints of spasms in his right shoulder blade with increased activity.  (R. at 348.)  At the same time, he reported that he was completely independent in household chores, errands, shopping, cooking, dressing and bathing himself. (R. at 349.)  He could mow and weed the lawn with difficulty, and play catch or shoot baskets with his son for 15 to 20 minutes before

requiring rest. R. at 349. After completing a mental examination, Dr. Evans concluded Jimenez's psychological status is consistent with a psychologically based pain disorder. R. at 351.

Five days later, Plaintiff went back to Dr. Berens with complaints of increasing pain. (R. at 361.) He reported that he was unable to mow the lawn or throw the ball due to the pain. He also had trouble driving. (*Id.*)  Dr. Berens continued to prescribe Cataflam and Ultram.  Plaintiff returned for another examination on September 10, 1999, again complaining of increased pain. (R. at 359.) This time, he received a prescription to try Celebrex instead of Cataflam. R. at 359.

On November 8, 1999, Dr. Berens completed another questionnaire from Plaintiff's attorney. (R. at 356.)  He stated that Plaintiff had been disabled since January 23, 1997 and would miss two or three days of work per week if he had a job.  (R. at 358.) The evidence described up to this point was before the ALJ when he denied Plaintiff's claim in January 11, 2000.

On May 8, 2002, Dr. Boehle responded to an inquiry from Plaintiff's attorney. He did not examine the plaintiff, but was writing to clarify his statements from December 12, 1996 when he last saw the plaintiff. (R. at 541.)  In 1996, his diagnosis was chronic myofascial pain syndrome with cervicothoracic and mild to moderate right shoulder mobility dysfunction, but he also stated that plaintiff had achieved MMI.  He imposed permanent work restrictions against repetitive motion of the right shoulder, no lifting over 20 pounds, no repetitive lifting, no repetitive overhead reaching, no carrying over 30

pounds, no repetitive twisting or bending of the neck or upper spine. (*Id.*)  In May 2002, he reiterated his earlier diagnoses, and clarified that the work place restrictions indicate that plaintiff should avoid constant use or repetitive repetitions with the right arm, including avoiding use of the arm more than two-thirds of the time, but that he could use the arm "frequently" for periods of 15 minutes, rest for an additional 20-30 minutes, and then resume frequent use again. (R. at 542.)  Boehle stated Jimenez could perform unlimited activities with his hands, such as typing, doing fine motor skills with his hands or small parts assembly so long as it did not involve forceful activity with the right arm or heavy lifting over 20 pounds with the right arm. (R. at 542.) He could reach to shoulder height and above up to two-thirds of the time as long as he remains within the weight limit restriction of 20 pounds and does not do any activity of great frequency than a frequent level of activity or one-thirds to two-thirds of the time using the right arm. (*Id.*) Dr. Boehle also recommended that Jimenez not perform his earlier warehouse work due its repetitive nature, but he could do a more sedentary or less physical type of work. R. at 542.

On May 13, 2002, Plaintiff stated that he had applied for part-time customer service positions at WalMart, K-mart, King Sooper's, Safeway, Grocery Warehouse, AT&T, and Family Dollar Store. R. at 421-422. The last item in the record was dated May 15, 2002, when Dr. Berens completed a questionnaire from Plaintiff's attorney. (R.at 544.) Responding to questions presented by the attorney, Berens agreed that Jimenez's complaints of pain were "genuine"; that "repetitive motion of Jimeneze's right

10

arm," "overhead reaching [and] lifting" and "repetitive grasp[ing]/lift[ing]/twist[ing]" were "restricted"; and that Jimenez was "limited in handling and manipulating small objects with his right hand." (R. 544-45.)   He indicated Jimenez could perform repetitive right arm motions for up to 10 minutes, and that he would need to rest 30 or 40 minutes before resuming them. (*Id.*)

### B. 2002 ALJ Decision.

In reviewing Jimenez's case on remand, the ALJ found Jimenez retained an RFC for "light work with occasional overhead reaching" and, based on testimony from the VE, could perform his past relevant work as a shipping order clerk. (R. at 409-10.) Alternatively, the ALJ concluded that even if Jimenez could not perform his past relevant work, he could perform a significant number of jobs in the national economy – including information clerk, telemarketer, private dispatcher, quotation clerk, furniture rental consultant, and gate guard – such that he was not disabled. (R. 411.) Jimenez appealed.

### II.  Standard of Review.

The court reviews the Commissioner's decision to determine whether his factual findings were supported by substantial evidence in light of the entire record and whether he applied the correct legal standards. *See Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997). Substantial evidence is that which a reasonable person would accept as adequate to support that determination. *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1498 (10th Cir. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d

1371, 1374 (10th Cir. 1992). The court examines the "record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine[s] if the substantiality of the evidence test has been met." *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999) (internal quotation marks and citations omitted). While the court examines the record meticulously in its entirety, it may neither reweigh the evidence nor substitute its discretion for that of the Commissioner. *See Musgrave*, 966 F.2d at 1374. I will reverse the Commissioner's denial of benefits only if I determine the decision was not supported by substantial evidence or find the ALJ failed to apply the correct legal standard or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed. *Nielson v. Sullivan*, 992 F.2d 1118, 1119-20 (10th Cir. 1993).

### III.  Discussion.

The Commissioner has established a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act and is thus entitled to disability benefits. 20 C.F.R. §§ 404.1520, 416.920. *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1998) (describing the five steps in detail). The claimant bears the burden of proof through step four of the analysis. *Nielsen*, 922 F.2d at 1120. Once the Commissioner has determined at step four that the claimant cannot perform his past relevant work, the claimant has established a prima facie case of disability. *Id*. At step five, the burden shifts to the Commissioner to show that the claimant can perform work that exists in the national economy, taking into account his residual functional capacity,

age, education and work experience. *Id*.

Jimenez appeals the Commissioner's denial of benefits on two grounds, both in regard to step four. Jimenez's first assertion – that the ALJ abused his discretion in 2002 by revising the 2000 RFC – fails because the Appeals Council vacated the 2000 ALJ decision. The ALJ was therefore bound to reconsider all pertinent issues in the record *de novo*, HALLEX I-2-818A, and was authorized to "take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977, 415.1477.

Plaintiff's second argument is that the ALJ failed on remand to explain why Jimenez's RFC included restrictions allowing for "occasional" reaching when three different doctors, referencing Drs. Berens, Shoemaker and Boehle, restricted repetitive use of the right upper extremity entirely. *See* Pl.'s Br. at 7. Jimenez's position is overstated, however. With the exception of Berens, none of these physicians imposed such sweeping restrictions[2] and Shoemaker and Boehle, in fact, specifically found Jimenez capable of working precisely the type of light or sedentary job ultimately described by the VE and adopted by the ALJ.

Plaintiff argues the ALJ erred in failing to explain why he omitted in the 2002

---

[2] Berens in May 2002 reiterated 1999 restrictions barring "repetitive motion" of the right arm as well as "overhead reaching, lifting [and] repetitive grasp[ing]/lift[ing]/twist[ing]." (R. 544 (2002) and R. 346.) Dr. Shoemaker's December 1998 evaluation restricted the "strenuous or repetitive use of the right arm," but found Jimenez otherwise employable "in some capacity where the heavy lifting with the right arm and any out of body reaches or above head reaches with the right arm [c]ould be avoided." (R. at 328.) Dr. Boehle in May 2002 stated Jimenez should avoid "constant use of the right arm or repetitive repetitions [sic] with the right arm," but qualified that restriction by saying Jimenez may "frequently use the arm for periods of 15 minutes, then should rest the arm for an additional period of 20-30 minutes, and then may resume frequent use of the arm again." (R. 541-42).

13

RFC the only "occasional" handling fingering restrictions of the 2000 RFC. The simple answer is that the Appeals Council vacated the 2000 decision and the ALJ was not bound by it. He was, in fact, bound to reconsider all evidence in the record *de novo*, including the post-remand conclusion of Dr. Boehle that Jimenez was able to perform "unlimited" activities with his hands. (R. 542.) This opinion was consistent with all of the other doctors' evaluations, including Dr. Shoemaker's finding that Jimenez had "full range of motion of the fingers, wrist and elbow" (R. 327), Dr. Crosson's finding in 1997 that both of Jimenez's hands were "visibly normal" and "very dexterous" (R. 214), and, more significantly, is not inconsistent with Dr. Berens's treatment notes over the years.

None of Dr. Berens' treatment or referral notes ever showed Jimenez complaining of problems with his hands or with his ability to handle or finger objects. Jimenez presented to Dr. Berens with complaints of muscle and shoulder pain which, according to Dr. Berens, increased over time. Dr. Berens articulation of restrictions on the "handling and manipulating" of objects was only in response to a questionnaire from Jimenez's attorney (R. 545) and even then, was limited to "small" objects manipulated with the right hand only. (*Id.*) I find no error in the ALJ's omission in the 2002 RFC of Dr. Berens's limitation on handling small objects with his right hand. Moreover, I agree that even if the omission could be found to have been in error, the error would be harmless because none of the jobs to which the VE testified and which the ALJ concluded Jimenez could perform (information clerk, furniture rental clerk, and gate guard) required "unlimited" or unrestricted use of the hands.

The ALJ is required to consider every medical opinion in the record. 20 C.F.R. § 416.927(d). The weight an ALJ must give each opinion, however, varies according to the relationship between the medical professional and the claimant. *See id*. An ALJ must give "controlling weight" to a treating source's opinion, so long as it is "well-supported" and "is not inconsistent with other substantial evidence in [the] record." *Id*. § 416.927(d)(2). "When a treating [source's] opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other [source's] reports to see if they outweigh the treating [source's] report, not the other way around." *Goatcher v. U.S. Dep't of Health & Human Servs.,* 52 F.3d 288, 290 (10th Cir. 1995) (quotations omitted). If an ALJ rejects a treating source's opinion, he must articulate "specific, legitimate reasons" for his decision. *Id*.; *see* 20 C.F.R. § 416.927(d)(2)-(6). The opinion of an examining physician or psychologist is generally entitled to less weight than that of a treating physician or psychologist, and the opinion of an agency physician or psychologist who has never seen the claimant is generally entitled to the least weight of all. *See* 20 C.F.R. § 416.927(d)(1), (2); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *2. If an ALJ intends to rely on a non-examining source's opinion, he must explain the weight he is giving it. 20 C.F.R. § 416.927(f)(2)(ii).

In making a decision, an ALJ must relate his conclusions to specifics in the evidence. *See Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996). In *Winfrey*, the ALJ stated his RFC and claimed it was based on "a reasonable understanding of the medical records." *Id*. The Tenth Circuit indicated that the ALJ erred by not relating his

conclusions to the evidence. In doing so, it noted that the ALJ's conclusions differed dramatically from the treating psychologist, "a difference which the ALJ did not explain." *Id.* In the end, the Tenth Circuit reversed and remanded "[b]ecause the ALJ committed numerous legal errors and his ultimate conclusion was not supported by substantial evidence." *Id.* at 1026.

Applying these standards in the instant case, I find substantial support in the record for the RFC found by the ALJ.  Although the ALJ does not explicitly say so, his RFC tracks the conclusions of Dr. Boehle in May 2002 allowing for some overhead reaching but unlimited handling and fingering with the hands. *See* R. 542.  Contrary to Jimenez's assertion, Dr. Berens is the only one of the three doctors identified by Jimenez whose limitations explicitly contradict this RFC (by precluding any reaching or repetitive grasping, lifting or twisting of the right arm).  (*See* R. at 340 (Dr. Berens April 1998 Continuation of Disability report for Minnesota Mutual) and R. 544 (May 2002 letter to Jimenez attorney after remand)).

The ALJ observed that Dr. Berens "apparently relied quite heavily on the subjective complaints provided by the claimant to complete the questionnaire from the claimant's attorney on May 15, 2002."  (R. 409.)  In giving less weight to Dr. Berens' opinion, the ALJ noted his restrictions were inconsistent with the majority of the record, including conclusions by at least 6 other treating and evaluating physicians besides Dr. Boehle who found little or no physical or neuromuscular deficits, and contradicted his own statements in earlier evaluations that Jimenez was capable of working at light or

sedentary jobs. (*See* R. 342 (12/97 Physician's Statement).) The ALJ engaged in a review of the entire record and included a lengthy recitation of these visits and resulting medical records in his decision. No other doctor besides Berens called for more restricted limitations than those reflected in the ALJ's RFC, and even Berens' restrictions would provide for no different answer at Step 5. The ALJ's findings regarding Jimenez's RFC find substantial support in the record and his rejection of Dr. Berens' more restrictive limitations was not only adequately explained for purposes of *Winfrey*, but would be harmless error even if erroneous.

Based on the foregoing, I AFFIRM the Commissioner's decision on remand.

Dated this 5th day of December, 2005.

BY THE COURT:

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE